IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| DANIEL SNYDER and JAIME SNYDER, his wife, on their own and on behalf of their minor son, J.S., | ) ) ) ) Civil Action No. |
| Plaintiffs, | ) ) ) |
| v. | ) ) |
| SUMMERSET NEIGHBORHOOD ASSOCIATION, a Pennsylvania Nonprofit Corporation, and SUMMERSET DESIGN REVIEW BOARD, | ) ) ) ) ) ) ) |
| Defendants. | ) **JURY TRIAL DEMANDED** |

CIVIL ACTION
**COMPLAINT**

1.      This is a civil rights action brought under the Federal Fair Housing Act of 1968, as amended by the Fair Housing Amendments Act of 1988, 42 U.S.C.A. §§ 3601-3631 ("FHA") and the Pittsburgh, Pennsylvania Code of Ordinances, Title 6, Art. V., Chap. 659.03, to address Defendants' discriminatory actions against Plaintiffs, Daniel Snyder and Jaime Snyder, his wife, on their own and on behalf of their minor son, J.S. (collectively hereinafter referred to as, "the Snyders" or "Plaintiffs").  Defendants herein violated the FHA by (a) refusing to provide a reasonable accommodation to J.S., a minor child with a disability, an equal opportunity to use and enjoy his family's entire residential home located within Summerset at Frick Park; and (b) interpreting and applying the Summerset Design Code and taking other action for the sole

{S0332834.1}

purpose of preventing a disabled J.S. from using and enjoying his family's entire residential house within Summerset at Frick Park.

2. The Snyders own a residential home in a planned community named, Summerset at Frick Park ("Summerset"). The Executive Board of the Summerset Neighborhood Association ("SNA") is the governing body of Summerset, a planned community. The Summerset Design Review Board ("DRB") administers the Design Code for real estate located within Summerset.

3. The Snyders seek preliminary injunctive relief and, thereafter, permanent injunctive relief, compensatory damages, punitive damages and recovery of attorney's fees and costs associated with this action.

## JURISTDICTION AND VENUE

4. This Court has jurisdiction over this lawsuit pursuant to 28 U.S.C. §§ 1331, 1343(a)(3), 1343(a)(4) and 42 U.S.C. § 3613.

5. Declaratory relief is sought under 28 U.S.C. §§ 2201 and 2202.

6. Plaintiffs' claims are authorized under the Fair Housing Act, 42 U.S.C. §§ 3601-3631 and 42 U.S.C. § 1983.

7. Plaintiffs' claims and any pendant state law claims arising hereunder are also authorized under the Pittsburgh, Pennsylvania Code of Ordinances, Title 6, Art. V., Chap. 659.03.

8. Venue is appropriate in the Western District of Pennsylvania pursuant to 28 U.S.C. § 1391(b)(2) and (c) because a substantial part of the events giving rise to Plaintiffs'

claims occurred in Allegheny County and the Defendants' contacts to Allegheny County are sufficient to subject them to personal jurisdiction in the Western District of Pennsylvania.

## PARTIES

9.  The Snyders are individuals who own a residential home in Summerset. The Snyders are the parents of an eighteen (18) month old child, J.S., with a disability. The Snyders file this complaint on their own behalf and on behalf of their minor son, J.S., who lives with his parents and his older brother, also a minor, in their residence. The Snyders' minor son, J.S., suffers from glaucoma as well as a genetic disease, Neurofibromatosis Type 1, and is "handicapped," as that term is defined in 42 U.S.C. § 3602(h). The Snyders are "aggrieved persons" as that term is defined pursuant to 42 U.S.C. §§ 3612(a)(1) and 3602(i) and have standing to maintain this action.

10.  Defendant, SNA, is a Pennsylvania Nonprofit Corporation, with its principal place of business in Allegheny County. The SNA is the governing body of Summerset. The SNA is governed by an Executive Board comprised of five (5) individuals, all residents of Summerset. The SNA through its Board(s), agents, officers and employees administers land use codes and regulations for residences located within Summerset.

11.  At issue in this case is the "Declaration of Summerset at Frick Park, a Planned Community" ("the Declaration"), which established Summerset. The Declaration was recorded with the Allegheny County Recorder of Deeds in 2001 pursuant to the Pennsylvania Uniform Planned Community Act, 68 Pa.C.S. § 5101, *et seq*. A number of amendments to the Declaration have been adopted and recorded since the Declaration was originally drafted.

12. The Summerset Design Code was promulgated at some point after the Declaration. Among other things, the Design Code sets forth guidelines pertaining to the modification of the exterior of homes within Summerset.

13. Pursuant to the Declaration, Defendant Summerset DRB, is a body of individuals appointed by the SNA to administer the Summerset Design Code (during points in this Complaint, the Executive Board of the SNA, and the DRB may be collectively referred to as, "Defendants").

## RELEVANT FACTUAL BACKGROUND

14. In or around March 2007, the Snyders purchased their residence, a single family home, in Summerset. At the time of the purchase, the Snyders had one child, a son who is now four years old.

15. In 2010, the Snyders' had a second child, J.S. At birth, J.S. was diagnosed with congenital glaucoma in his right eye. As a result of his glaucoma, J.S.'s vision is severely impaired and his right pupil is in a constant state of dilation and he cannot be exposed to, and has extreme sensitivity to, direct sunlight.

16. When J.S. is exposed to direct sunlight, he experiences severe eye pain and tearing of his right eye.

17. Soon after his birth, J.S. was also diagnosed with a genetic disorder, Neurofibromatosis Type 1 ("NF-1"), which is a life-threatening disease that causes tumors, sometimes cancerous, to grow on nerve endings within J.S.'s body. J.S.'s NF-1 does not contribute to his vision impairment or light sensitivity, but because NF-1 is extraordinarily rare, it is not clear to J.S.'s doctors whether his congenital glaucoma is related to his NF-1 diagnosis.

18.     Due to his glaucoma and since his birth, the Snyders have kept J.S. out of direct sunlight. If he goes outside, he is shielded from the sun by wearing sunglasses and/or a large-brimmed hat at all times.

19.     In the beginning of his life, before he became mobile, the Snyders could control where J.S. went within their home, and J.S. remained indoors for most daylight hours. Similarly, the windows in the Snyders' family car were tinted to block out as much sunlight as possible.

20.     In the Spring of 2011, as J.S. began to walk, the Snyders realized that they needed to ensure that J.S. did not wander into or play in areas of the home that were not shielded from direct sunlight. Accordingly, they installed black-out blinds on the windows of their home that were exposed to many hours of direct sunlight.

21.     The master bedroom and the large balcony off of the master bedroom on the second-floor of the Snyders' home face east, and as a result, both areas are filled with direct sunlight on sunny days.

22.     For the first twelve (12) months of his life, J.S. did not go into his parents' bedroom unless the black-out blinds were drawn closed, and he never went out on the large second-floor porch.

23.     Restricting J.S.'s movement away from those areas became increasingly difficult and unfair as J.S. became more mobile and began to walk independently.

24.     The Snyders wanted J.S. to be able to use and enjoy their master bedroom without first needing to ensure that the black-out blinds were closed.

25. Likewise, the Snyders wanted J.S. to be able to play on the expansive albeit contained second-floor porch during the day, especially since he was not otherwise able to freely play outside due to his extreme sensitivity to sunlight.

26. The Snyders have a covered front porch on the front of the first floor of their home; however, due to the design and pitch of the roof on the front porch, on sunny days, sunlight floods the majority of the front porch for several hours of the day.

27. Based on these concerns, the Snyders investigated changes they could make to their residence that would provide substantial shade to both the master bedroom and the second-floor porch that would enable J.S. to use and enjoy those areas.

28. The Snyders placed a porch swing covered by an umbrella on their second-floor porch, but it did not provide adequate shade for the porch or the master bedroom.

29. On April 21, 2011, the Snyders, requested permission from the DRB to install a retractable armless awning atop the second floor porch. (A copy of the April 21, 2011 letter and enclosures are attached hereto as Exhibit A).

30. In connection with their request for an awning, Defendants were provided with pictures and specifications for the requested awning, and were advised that the awning is fully retractable, does not have a visible arm component, and when retracted it is hidden by the roof eve that overhangs the Snyders' roof by 1 ½ feet. (See id.).

31. As set forth in their April 21, 2011 request, and as further articulated in written correspondence on June 6, 2011, the Snyders sought to install the awning in an effort to provide shade over the second-floor porch because of his glaucoma so that J.S. could fully use and enjoy

his residence.  (See Exhibit A; see also June 6, 2011 correspondence, attached hereto to as Exhibit B).

32. As part of their request for the awning to the DRB, the Snyders explained details pertaining to J.S.'s sunlight sensitivity, his glaucoma, and attached two separate notes from physicians, both of which explained their son's disability and his sensitivity to sunlight.  (See Exhibit B).

33. By its very nature, the requested awning is retractable, and the Snyders have indicated to Defendants their intent to keep the awning retracted and out of view at night and on cloudy days.

34. At the time of the Snyders' April 21, 2011 and June 6, 2011 requests, while requests to install awnings were required to be submitted to the DRB, there was nothing contained in the Summerset Declaration or the Summerset Design Code that restricted the installation of awnings on homes in Summerset.

35. Further, when the Snyders made their requests on April 21, 2011 and June 6, 2011, they were aware of the fact that at least two other Summerset residents had retractable awnings, identical to the one requested by the Snyders, on their homes.  Those awnings were installed on the side of those residents' houses, although at least one of those awnings is visible while approaching the front of the house from the street.

36. On May 12, 2011, the Chair of the DRB, Craig Dunham, wrote to the Snyders and denied their request for the installation of a retractable awning, stating that the DRB would only consider, "…[a] modification to the building that is keeping with the architecture and permanent nature… similar to a pergola element with a low slope metal roofing or a pitched roof to appear

as though it was part of the house since its initial construction." (See May 12, 2011 Letter from C. Dunham, attached hereto as Exhibit C).

37. According to Defendants, the Snyders' request for an awning was denied in order to preserve, "the unique and quality architectural theme of Summerset [that] is central to the preservation of and appreciation in property values of all residents in Summerset." (See Position Statement of the Summerset Neighborhood Association, submitted to the Pittsburgh Commission on Human Relations on Aug. 25, 2011, at page 4, attached here to as Exhibit D).

38. In and around June 13, 2011, the Snyders filed a Complaint alleging disability discrimination with the City of Pittsburgh Commission on Human Relations ("PCHR").

39. The PCHR initiated an investigation into the Snyders' Complaint on June 14, 2011.

40. It is believed, and therefore averred that the PCHR gathered documents from the Snyders and Defendants and interviewed the parties.

41. At some point after the PCHR initiated its investigation into the Snyders' Complaint, in and around June 28, 2011, the Executive Board of the SNA passed an amendment to the Summerset Design Code that states, in relevant part:

> Section 5.1 of the Declaration provides for the review of any modification to the original building by the Design Review Board. Awnings are identified in 5.1.f as specifically subject to the review and approval of the Design Review Board…
>
> The following policy concerning awnings…is adopted:
>
> Awnings:
>
> Cloth, vinyl or metal awnings, either fixed or retractable are not permitted on any primary façade, facing the Front or Side Yard Zones, or otherwise visible from the public street.

> Awnings, are permitted in the Private Yard Zone of any home, subject to the review and approval of the Design Review Board. Colors, materials and installation methods shall be reviewed for permanence, compatibility to the original building, relationship to neighboring properties and other conditions of the Design Code. Fabric awning materials only shall be approved and solid colors only matching either the color of trim, body of home i.e. siding or brick color or the original accent colors of the home. Retractable awnings must be retracted when not in use.

\* \* \*

(See June 28, 2011 § 5.1 Amendment to Summerset Design Code, attached hereto as Exhibit E).

42. The Amendment to the Summerset Design Code was drafted more than two months after the Snyders' request to install a retractable awning.

43. Defendants have attempted to apply the § 5.1 Amendment to Summerset Design Code to retroactively apply to the Snyders' request for an awning on their residence.

44. Defendants further threatened to initiate proceedings to obtain a temporary restraining order against the Snyders if they took steps in furtherance of erecting a retractable awning.

45. Additionally, since the denial of the Snyders' awning request, and after the Snyders filed its Complaint with the PCHR, Defendants constructed and installed a "shade sail" in a prominent location at the Summerset neighborhood pool, which plainly resembles the same type of awning that Defendants refuse to allow the Snyders to install for their son's benefit. (A copy of photographs of the shade sail is attached and referred to as Exhibit F).

46. Contemporaneous with filing their Complaint with the PCHR, the Snyders continued to plead with the Defendants to consider their awning request. Instead, Defendants directed the Snyders to consider alternatives for shade, including: (a) a pergola structure; (b) a portable, large, high quality umbrella (or umbrellas) to shade the second-floor porch; (c) a

permanent extension to the roof over their second-floor porch; (d) the enclosure of their second-floor porch with a permanent sunroom structure; or (e) the use of other outdoor spaces, like a concrete slab area beside their garage.

47. With respect to the pergola and portable umbrella suggestion, the Snyders explained to Defendants that the suggestions of the pergola and portable umbrellas were impractical, given that both alternatives did not provide adequate shade and were not fabricated or intended to bear the weight of snow and ice that is common and unpredictable in Western Pennsylvania, and would therefore need to be taken down during many months of the year.

48. The Snyders further informed Defendants that the portable umbrella alternative – the design and characteristics of which were strikingly similar to the retractable awning requested by the Snyders – had legs and a wide base that pose a safety hazard to J.S., who is severely vision impaired.

49. At Defendants' request, the Snyders also contacted three contractors to explore the feasibility of building an extension to the roof of their home.  Each contractor came to the Snyders' home, provided estimates for the work, ranging from $25,000.00 to $40,0000.00, and each expressed concern about the engineering soundness of affixing an overhanging extension to their existing roof.  The Snyders notified Defendants of these events.

50. Likewise, and at Defendants' insistence, the Snyders spent time and money exploring the idea of building a sunroom to enclose the second-floor porch, that would contain sunlight-shielding glass.  After working with contractors to develop schematics for the sunroom, the Snyders informed Defendants that the cost of the sunroom was approximately $29,000.00 and sent proposed drawings for the sunroom to the DRB.

51.     Ultimately, the DRB rejected the Snyders' design concept for the sunroom, and suggested countless changes to the plans, which increased the price to build the sunroom well in excess of the projected $29,000.00 estimate. (See Denial Letter from C. Dunham dated July 5, 2011, attached hereto as Exhibit G).

52.     With respect to the roof extension and sunroom, the Snyders proposed that they would be willing to further consider the SNA's directive with respect to these alternatives if Defendants were willing to absorb the cost for these structure modifications to the extent that it exceeded the cost to install a retractable awning. Defendants rejected the Snyders' proposal.

53.     As for Defendants' suggestion that J.S. simply use the Snyders' other outdoor space, the Snyders informed Defendants that the other outdoor areas around their home – both their front porch and a small concrete slab beside their garage – are not adequately shielded from direct sunlight, nor did this suggestion address J.S.'s ability to use and enjoy the Snyders' master bedroom, which also required shade. (See Exhibit D, at pages 7-8).

54.     In response to the Snyders' demands that Defendants reconsider their denial of their request to install an awning, Defendants stated, "[p]resumably the child has his own bedroom, and [the Snyders] have not suggested any medical need of the child to use the master bedroom." (See Exhibit D, at p. 14).

55.     Thus, the Snyders considered and explored all of Defendants' directives in earnest, on their own time, at their own expense, and while their son lost the benefit and right to fully use and enjoy his home.

56.     The Snyders communicated to Defendants that their proposed "alternatives" to the retractable awning were unsafe, oppressively expensive, and impractical.

57. During the course of negotiations with Defendants, the Snyders have been approached by several neighbors in Summerset who have openly suggested that the Snyders' "public fight" reflect poorly on the neighborhood.

58. Several other neighbors whom the Snyders previously socialized with no longer return the Snyders' phone calls, text messages or social invitations.

59. Negotiations between the Snyders and Defendants broke down in August of 2011.

60. On September 14, 2011, the PCHR concluded its investigation and determined that the evidence considered by the Commission supported the Snyders' allegation of discrimination by Defendants. (See PCHR Letter, attached hereto as Exhibit H).

## CAUSES OF ACTION

### COUNT I
**Snyder v. Summerset Neighborhood Association and Summerset Design Review Board**
**Violation of the Fair Housing Act and Fair Housing Amendments Act**

61. Paragraphs 1 through 60 are hereby incorporated by reference.

62. The Snyders' home constitutes a "dwelling" as that term is defined under the FHA.

63. The Snyders' minor son, J.S., is a resident of the dwelling and is "handicapped" as that term is defined and used under the FHA.

64. The Snyders requested to modify their home to install a retractable awning above their second-floor porch in order to accommodate their son's handicap.

65. On several occasions, Defendants were made aware of J.S.'s handicap, and were likewise informed that the accommodation requested by the Snyders was made as a result of and to accommodate J.S.'s handicap.

66. Defendants denied the Snyders' request without reasonable basis and without a bona fide business interest to deny the Snyders' request for accommodation.

67. Notwithstanding their knowledge of J.S.'s handicap and that the modification was requested in order to accommodate this handicap, Defendants forced the Snyders to, at their own time and expense, endure months of interviewing contractors and obtaining plans for modifications that were "acceptable" to Defendants.

68. During this time, and up to the present date, J.S. has been unable to use and enjoy his entire residence.

69. As set forth in detail above, Defendants have discriminated against the Snyders and J.S. in violation of the FHA, including Defendants' steadfast refusal to make reasonable accommodation for J.S.'s handicap as required by 42 U.S.C. §3604(f)(3)(B).

## COUNT II
**Snyder v. Summerset Neighborhood Association and Summerset Design Review Board
<u>Declaratory and Other Injunctive Relief</u>**

70. Paragraphs 1 through 69 are hereby incorporated by reference.

71. There is real and actual controversy between the parties.

72. The Snyders and J.S. have no adequate remedy at law to guarantee their rights now and in the future other than in the form of injunctive and declaratory relief.

73. The FHA, at 42 U.S.C. § 3613(c)(1), entitles a resident that has been discriminated against to obtain injunctive relief to provide redress to the aggrieved party.

74. Here, Defendants have had reckless disregard for Plaintiffs' reasonable request for accomodation, and have needlessly prolonged J.S.'s access to a reasonable accommodation,

75. It has been approximately six (6) months since the Snyders requested permission to install a retractable awning above their second-floor porch in order to provide shade for their disabled son to use and enjoy the master bedroom and porch in the Snyders' residence.

76. Defendants refused to permit the erection of an awning even though no prohibition against such awnings existed in the Summerset Declaration or Design Code at the time of the Snyders' request.

77. As a direct result of Defendants' unreasonable and continued refusal to permit the erection of an awning, J.S. has been unable to use and enjoy the master bedroom and porch during most of the Spring and Summer months of 2011.

78. Until Defendants issue the required approvals to the Snyders, the Snyders cannot commence the necessary renovations for J.S. to be able to use and enjoy his family's entire home.

79. In addition to suffering from glaucoma, J.S. also has NF-1, which is a life-threatening genetic disease.

80. It is believed and therefore averred that at least some of the Defendants are aware of J.S.'s NF-1 diagnosis and understand that J.S. may not have a typical lifespan.

81. With each day that passes, Defendants' actions continue to violate Plaintiffs' federal rights as guaranteed by the FHA by intentionally blocking J.S. from using and enjoying his family's entire residence because of his disability.

82. There is a strong likelihood that Plaintiffs will prevail on the merits of this case at trial.

83. The PCHR, a neutral administrative body charged with assessing and administering FHA claims locally has conducted an investigation and issued a finding that supports the Snyders' claim for discrimination.

84. The Snyders and J.S. have, and will continue to, suffer emotional harm, inconvenience, harassment and humiliation, attorneys' fees, and the deprivation of constitutionally-guaranteed rights as a result of Defendants' actions.

85. Accordingly, Plaintiffs seek a preliminary injunction and then a permanent injunction enjoining Defendants from relying on the Summerset Declaration and Design Code to prevent the Snyders from installing a retractable awning atop their second-floor porch in order to shield their disabled minor son from the harmful effects of direct sunlight, and from enforcing the SNA Declaration and Design Code in a discriminatory manner that prevents J.S. from living in and enjoying his family's entire residential home in Summerset at Frick Park.

## **RELIEF SOUGHT**

WHEREFORE, the Snyders respectfully request that the Court award them the following relief:

A. Exercise jurisdiction over this action;

B. Issue an injunction enjoining Defendants from relying on the Summerset Declaration and Design Code to prohibits the Snyders from installing an awning in an effort to provide substantial shade over a balcony as well as in the master bedroom of their residential

home in Summerset at Frick Park so that their disabled infant son can fully use and enjoy his parents' bedroom and the second floor balcony;

  C. Order Defendants to permit the Snyders to commence the necessary improvement to their residence (retractable awning);

  D. Issue the appropriate preliminary declaratory relief and permanent injunctive relief, which includes a declaration that Defendants violated the Fair Housing Act and the Fair Housing Amendments Act;

  E. Award appropriate compensatory damages, punitive damages, and damages for emotional harm, inconvenience, harassment and humiliation;

  F. Award Plaintiffs the cost of this action together with their attorney's fees; and

  G. Grant such other relief as may be appropriate or necessary under the circumstances.

October 12, 2011

By: _____
James R. Hankle, Esquire
PA I.D. No. 36019
Email: jrh@sgkpc.com
Beverly A. Block, Esquire
Email: bab@sgkpc.com
PA I.D. No. 93406

*Attorneys for Plaintiffs, Jaime and Daniel Snyder and J.S. Snyder*

## **CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing **CIVIL ACTION COMPLAINT** was electronically-filed and copies were arranged to be served on the below individuals, this 12th day of October, 2011:

Joshua M. Farber, Esq.
Thorp Reed & Armstrong, LLP
One Oxford Centre, 14th Fl. | 301 Grant Street
Pittsburgh, PA 15219
Chair of the Executive Board for the Summerset Neighborhood Association

Craig Dunham
Ewart Building
925 Liberty Avenue, 8th Floor
Pittsburgh, PA 15222
Chair, Summerset Design Review Board

*With Courtesy Copy to:*
Alan E. Johnson
aejohnson@mdwcg.com
U.S. Steel Tower, Suite 2900
600 Grant Street
Pittsburgh, PA 15219
Counsel for SNA and DRB During Investigation by the PCHR

_____
Beverly A. Block